United States District Court

Eastern District of California

Gary Gene Angel,

       Petitioner,                     No. Civ. S 02-0247 FCD PAN P

  vs.                               Findings and Recommendations

E. Roe,

       Respondent.

-oOo-

    Petitioner is a state prisoner seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner was convicted in 1997 in the San Joaquin County Superior Court of first degree murder by personal use of a firearm, evading an officer in wanton disregard for the safety of others, and possession of a firearm by a felon.  He is serving a sentence of 61 years and four months to life for these crimes.

    Petitioner claims trial counsel provided ineffective assistance by failing to pursue diligently a written plea offer,

failing to successfully impeach prosecution witnesses Lenhardt and Craig Beck regarding deals they had made with prosecutors and other matters, and failing to object to witnesses testifying in jail garb in a courtroom filled with uniformed officers. Petitioner also claims his conviction should be reversed based on cumulative error.[1]

Petitioner filed the petition without counsel. After respondent answered and petitioner filed a traverse, petitioner substituted Frank Prantil as counsel and moved for leave to amend and to abey the proceedings. Petitioner sought to amend his pleading to allege prosecutorial misconduct and errors in jury instructions. The court denied the motion.

Factual Background

The court of appeal affirmed the conviction on these facts:

> Jay Beck was killed, and his brother, Craig Beck, was a witness to the killing. To distinguish between them we will refer to them by their first names only.
>
> Jay died of a single gunshot wound to the head on November 12, 1996. The witnesses to the killings, most of whom were firmly ensconced in the drug subculture and suffered definite credibility problems due to their lifestyles and felony convictions, testified at trial, giving differing versions of the events that led to Jay's death. The jury resolved the evidentiary conflicts and found the defendant guilty of first degree murder. Accordingly, our recitation of the

---

[1] Other claims in the petition were withdrawn in the traverse, viz., due process was violated because the conviction is unsupported by sufficient evidence of premeditation and deliberation, that petitioner is entitled to a new trial based on newly discovered evidence, that the trial court erred by giving a "consciousness of guilt" instruction, and that due process was violated when the California Court of Appeal denied a request by appellate counsel to expand the scope of her appointment to include the preparation of a habeas petition. Traverse at 19.

facts presents the evidence in the light most favorable to that outcome, except for various comments on the conflicting evidence. (See People v. Johnson (1980) 26 Cal.3d 557, 578.) Since the facts of the felony evading are not pertinent to the issues on appeal, we need not address them.

Prior to his death, Jay believed the defendant stole some equipment for manufacturing methamphetamine from him. He accused the defendant of doing so. The two agreed to meet at a garage to settle the issue by fighting.

The agreed upon location was a commercial garage used by Jim Lenhardt. Jay asked Craig to come and back him up. Both of them were unarmed. Jim Lenhardt was in the garage with the Becks, seated at a desk at the back of the garage. When the defendant entered the garage, he was carrying a whiskey bottle. Standing close to the desk at the back of the garage, Jay and the defendant argued about the equipment that Jay believed the defendant had stolen. Finally, the defendant said to Jay and Craig, "One of you guys is going to get shot." As he reached toward his waistband, Craig rushed him. The defendant hit Craig over the head with the whiskey bottle. The bottle broke and fell to the floor.

The defendant commanded Jay to get down on the floor. As Jay obeyed, the defendant put a gun to his head and executed him. After attempting to kick Craig in the face, the defendant then ran from the garage. Craig chased him. When Craig came out of the garage, the defendant shot at him, forcing Craig to duck back inside.

Most of the foregoing facts came from the testimony of Craig and Lenhardt, who testified early in the trial. The relevance of this situation will become apparent later in this opinion when we discuss the defendant's belated attempt to accept a plea offer from the prosecution after it had expired with the swearing of the jury and after Craig and Lenhardt had given this damning testimony. Before trial, Craig had indicated he would not testify because he was in custody and did not want to suffer the consequences from other inmates of testifying. Ultimately, he changed his mind and testified. Also before trial, Lenhardt, who was also in custody at the time of trial, saw the defendant in a different courtroom. The defendant called Lenhardt a

"rat." Lendardt testified that "rat" meant "somebody who is testifying and somebody who isn't going to make it out on any prison yard for any length of time that's for sure [sic]." Lenhardt testified despite the defendant's attempt to intimidate. As the defendant concedes, "the prosecution's case as to the murder charged in count I rested on the testimony of Craig Beck and Lenhardt versus that of [the defendant]."

Back to the facts of defendant's crimes: A security guard working close by heard a gunshot and saw the defendant fleeing the premises with a gun in his hand. He also saw Craig come out of the garage, bloodied and yelling, "You shot my brother." A police officer, who had previously conducted surveillance on the garage and was less than two blocks away, heard a shot. He arrived on the scene within minutes after the incident. He found Jay dead of a gunshot wound and Craig, bleeding and distraught, saying that the defendant had shot Jay.

Investigating officers found a broken whiskey bottle and a spent casing in the garage. They also found a spent casing in the driveway, where Craig described the defendant as standing when he fired the second shot. A gunshot residue test on Craig revealed no reside on his hands.

The gunshot that killed Jay entered his left temple, went through his brain, fractured his skull, and exited above his right ear. Soot, tearing, and bruising in the wound indicated that the gun had been held against Jay's head when the shot was fired.

The focus of the defendant's case was that Craig Beck fired the shot that killed his brother.

The defendant heard from others that Jay had threatened to kill him; however, he laughed off these threats and said, "I wouldn't let him kill me if there was 10 of him." The defendant presented witnesses who testified Craig either had or may have had a gun on the day of Jay's death. The defendant also presented witnesses who said that Jay called for Craig to go over to the garage that evening so Craig could "watch his back."

The defendant testified he went to the garage that evening but that he did not have a gun. He saw a gun on the desk where Lenhardt was sitting. Jay confronted the defendant about the property Jay believed the defendant had stolen and then swung at the defendant.

>     Craig came at him with a gun, so the defendant hit
>     Craig in the head with the whiskey bottle he had
>     carried into the garage. The defendant heard two
>     shots, then ran from the garage. Craig followed the
>     defendant out of the garage and pointed the gun at the
>     defendant. As he fled, the defendant heard another
>     shot.

Answer, Ex. B (Ex. B) at 2-5.

Governing Law

Principles of comity and federalism counsel against a federal court's substituting its judgment for that of the state courts, a deference proscribed in the federal habeas statute as amended by the Anti-Terrorist and Effective Death Penalty Act (AEDPA). Taylor v. Maddox, 355 F.3d 992, 999 (9th Cir. 2004).

Some of petitioner's claims challenge legal determinations by the state court. 28 U.S.C. § 2254(d)(1). This court cannot grant habeas relief unless the state court's determination of petitioner's claim was contrary to or an unreasonable application of federal law as clearly established by the United States Supreme Court.[1] Id.

---

[1] A decision is contrary to clearly established federal law if it fails to apply the correct controlling authority, or if it applies the controlling authority to a case involving facts materially indistinguishable from those in a controlling case, but nonetheless reaches a different result. Williams v. Taylor, 529 U.S. 362, 413-14 (2000). A decision involves an unreasonable application of federal law if the state court identifies the correct governing legal principle but applies that principle to the facts of the prisoner's case in a manner that is "objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63 (2003). "Clearly established federal law" is defined as the holdings of the United States Supreme Court existing when the state court issued its decision. Williams, 529 U.S. at 412. Where the state court summarily denies the petition without comment, the district court will look to the last reasoned state decision on the issue. Ylst v. Nunnemaker, 501 U.S. 797 (1991). If none exists, the district court must independently review the record to determine whether the state ruling was contrary to or an unreasonable application of clearly established federal law. Delgado v.

5

Petitioner's claims of ineffective assistance of counsel in plea negotiations challenge factual determinations by the state court.

> When it comes to state-court factual findings, AEDPA has two separate provisions. First, section 2254(d)(2) authorizes federal courts to grant habeas relief in cases where the state-court decision was based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding. Or, to put it conversely, a federal court may not second-guess a state court's fact-finding process unless, after review of the state-court record, it determines that the state court was not merely wrong, but actually unreasonable. Second, section 2254(e)(1) provides that a determination of a factual issue made by a [s]tate court shall be presumed to be correct, and that this presumption of correctness may be rebutted only by clear and convincing evidence.

Taylor, 366 F.3d at 999 (internal citations and quotations omitted). The first provision applies to situations where a petitioner challenges the state court's findings based entirely on the state record. Before concluding a state-court finding is unsupported by substantial evidence in the state-court record, a federal court must "be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." Taylor, 366 F.3d at 1000. Similarly, before concluding the state-court fact finding process is non-existent, or defective in some material way, the federal court "must be satisfied that any appellate court to whom the defect is pointed out would be unreasonable in holding that the state court's fact finding

---

Lewis, 223 F.3d 976, 981-82 (9th Cir. 2000).

process was adequate." Id.

Analysis

Petitioner's claims all allege ineffective assistance of counsel. To establish a violation of the Sixth Amendment, a petitioner must first show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. See Strickland v. Washington, 466 U.S. 668, 688 (1984). The court must determine whether the acts or omissions identified by the petitioner were outside the wide range of professional, competent assistance. Id. at 690. If so, the court must then examine whether those errors prejudiced the petitioner. Id. at 693. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Id. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id.; see also Williams, 529 U.S. at 391-92; Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000). The prejudice analysis focuses on "whether counsel's deficient performance render[ed] the result of the trial unreliable or the proceeding fundamentally unfair." Lockhart v. Fretwell, 506 U.S. 364, 372 (1993).

    A.   Ineffective Assistance in Plea Negotiations

In an information filed January 28, 1997, petitioner was charged with first degree murder by use of a firearm, attempted murder, evading an officer in wanton disregard for the safety of others and possession of a firearm by a felon. The information

7

alleged petitioner used a firearm during the commission of the murder and had suffered one prior "strike" and served three prior prison terms. (CT 2, 4-5.) February 5, 1997, petitioner pleaded not guilty and denied alleged sentence enhancements. (CT 170.)

May 27, 1997, defense counsel Hirschfield requested the prosecutor provide a written plea offer. (RT 466, 473-74, 1091, 1096, 1120.) The prosecutor prepared a written proposal that petitioner serve 23 years and four months' imprisonment for voluntary manslaughter, use of a firearm, and felony evasion of an officer and left it at the district attorney's office for counsel to pick up. (Pet'n Ex. 1 at 1-2, CT Supp. 4, RT 473, 1092.) The offer stated it would remain open until the jury was sworn. (Pet'n Ex. 1 at 1-2.) Hirschfield did not pick up the written offer. (RT 1103, 1106.) At the end of the day May 28 the jury was sworn. (CT 196, RT 1092, 1094-95, 1102, 1105.) May 29 and 30 the prosecutor called witnesses including Craig Beck and Lenhardt.

On the afternoon of June 2, 1997, (Memorial Day holiday) Hirschfield's secretary picked up the written offer from the district attorney's office. (RT 464, 1103.) Lenhardt and several other prosecution witnesses testified June 3. At the end of court that day, in petitioner's presence, Hirschfield raised the issue of the written offer. Hirschfield told the trial court he had received it the previous day, had notified petitioner about its contents but not been able to discuss it with him, and could not respond "one way or the other" whether petitioner

1 wanted to accept the offer.  (RT 464-69.)

2    The morning of June 4, 1997, Hirschfield informed the court petitioner wished to accept the offer so long as it included the dismissal of another pending case.  (RT 471.)  The prosecutor stated there was nothing to accept because the offer had expired.  (RT 473-74.)  Trial resumed and petitioner was convicted June 16, 1997, of all counts except attempted murder.  (CT 399-400.)  The next day the trial court found petitioner had one prior serious felony conviction and had served two prior prison terms.  (CT 422; RT 1071-73.)

    June 26, 1997, Hirschfield moved the court to appoint conflict counsel to investigate whether he was ineffective with respect to the plea bargain offer.  (RT 1077-79.)  The court granted the motion and appointed conflict counsel Paniero.  Id.

    July 24, 1997, petitioner moved for enforcement of the written plea bargain based on ineffective assistance for failing to "communicate a plea bargain," citing United States v. Blaylock, 20 F.3d 1458 (9th Cir. 1994).  (CT Supp. 1-4.)

    August 4, 1997, the trial court held an evidentiary hearing.  (RT 1087-1137.)  The prosecutor testified Hirschfield had "pushed for a written offer" May 27, 1997, and thus she prepared one.  (RT 1091-92.)  Terms similar or identical to those in the written offer previously had been communicated orally to Hirschfield and rejected.  (RT 1091, 1095-96.)  She and Hirschfield did not discuss the offer again before the jury was sworn.  (RT 1092-93.)

    Hirschfield testified the prosecutor orally had offered to

resolve the case along terms similar or identical to those in the written offer.  (RT 1098-99.)  Hirschfield had conveyed the oral offer to petitioner; petitioner was willing to accept it but Hirschfield advised him not to.  (RT 1099-1101; RT 1111.) Petitioner was willing to plead to manslaughter and a "strike" and accept a sentence of over 20 years.  (RT 112-16.)  After picking up the written offer June 2, Hirschfield told petitioner about it before court the morning of June 3 and petitioner said he wanted to accept it.  (RT 1104.)  Petitioner's testimony was consistent with Hirschfield's.  (RT 1124-28.)

Panerio argued Hirschfield provided ineffective assistance because he knew his client wanted to accept the deal but did not convey that to the prosecutor.  (RT 131-32.)  The prosecution argued Hirschfield did not know of the written offer and showed negligence, at most, in failing to pick it up.  (RT 1134-36.)

The court refused to enforce the written offer, stating:

> I'll deny [the motion] at this point.  I can't see that Mr. Hirschfield did not convey all proper offers made, preliminary negotiations, which took place prior to the actual offer in writing on the 28th – were all conveyed . . .  I don't see there was any ineffective assistance of counsel.  At this time, the crucial thing is whether he should have picked up the mail when actually the offer was on the table when actually reduced to writing by [the prosecutor].  I keep banging my head against – I don't know how an attorney who didn't know about an offer at the DA's office – that it was there – how it's below the standard of competency and did not pick it up.  That is basically what I would have to find.  I would have to find – to find that Mr. Hirschfield at this time to be ineffective in assisting Mr. Angel.  It's too bad if the offer actually would have been accepted that it wasn't conveyed and Mr. Angel was aware of it.  At this point, you've got an appellate issue.  I may be wrong on the issue, Mr. Angel, but it seems to me that he did what he had to do under the

1 circumstances.

2 (RT 1136-37.)

3 Petitioner appealed, claiming counsel provided ineffective assistance by failing to act on his client's desire to accept the offered plea bargain. (Ex. A, Appt's Opening Brief 31-56.)

6 The court of appeal rejected petitioner's argument, stating whether Hirschfield erred in failing to pick up the written offer was irrelevant because it was "essentially the same" as the prior oral offer. Ex. B at 12. The court continued:

> [T]he trial court did not err in finding defense counsel was not ineffective, despite the testimony to the effect that the defendant wanted to accept the plea offer but counsel did not convey that desire to the prosecution.
>
> * * *
>
> While the trial court made explicit findings regarding the claim of ineffective assistance of counsel as it relates to picking up the written offer from the box at the district attorney's office, those explicit findings are not inconsistent with implicit findings that counsel, contrary to some of the testimony during the hearing, dutifully conveyed the oral plea offer to the defendant and that the defendant rejected those offers. In light of the standard of review, we must infer the trial court made these findings. The circumstances support such an inference regarding the trial court's credibility determinations: the prosecution's offer was conveyed to the defendant; the defendant indicated a desire to accept the plea only after the first two witnesses provided unexpectedly damning evidence . . . . Therefore, we conclude the trial court did not err in denying the defendant's motion to enforce the plea offer based on ineffective assistance of counsel because, according to proper inferences credited to the trial court's ruling, attorney Hirschfield did not fail to accept a plea offer the defendant wanted.

Ex. B at 13, 17.

The California Supreme Court denied review of this ruling without comment.

11

1   "A criminal defendant has the ultimate authority to make
2 certain fundamental decisions regarding the case, as to whether
3 to plead guilty, waive a jury, testify in his or her own behalf,
4 or taken an appeal." Jones v. Barnes, 463 U.S. 745 (1983). A
5 criminal defendant is entitled to effective assistance of counsel
6 during all critical stages of the criminal process, including
7 plea negotiations. Hill v. Lockhart, 474 U.S. 52, 57 (1985);
8 United States v. Leonti, 326 F.3d 1111 (9th Cir. 2003).[2]

9   Petitioner and Hirschfield testified during the evidentiary
10 hearing petitioner told his lawyer to accept the prior oral offer
11 but he refused.  They also testified petitioner instructed
12 Hirschfield the morning of June 3, before court commenced, to
13 accept the written offer.  This testimony is controverted by the
14 statements and silence of petitioner and his lawyer during trial.
15 Petitioner, no novice to criminal proceedings, sat silently
16 through trial proceedings May 28, 29 and 30 and June 3, clearly
17 acquiescing in Hirschfield's decision to try the case rather than
18 accept the offered disposition and plead guilty.  Hirschfield
19 then stated at the end of the day June 3, in petitioner's
20 presence, that the defense needed more time to consider whether
21 it found the written offer palatable.  Petitioner did not
22 contradict him.  Petitioner never informed the court Hirschfield

---

[2] A fair trial after plea negotiations end does not remedy a violation of these rights. See Blaylock, 20 F.3d at 1466; Nunes v. Mueller, 350 F.3d 1045, 1052 (9th Cir. 2003).  If a habeas petitioner prevails on a claim of ineffective assistance in the plea process, appropriate remedies include requiring the government to reinstate its plea offer.  Blaylock, 20 F.3d 1458; Nunes, 350 F.3d 1045; Riggs v. Fairman, 399 F.3d 1179 (9th Cir. 2005).

was refusing petitioner's instructions to accept the offer. This evidence supports the conclusion petitioner never decided to accept the offer until after the close of court June 3.

The state court concluded after adequate fact-finding process that petitioner never expressed a desire to accept the offer, to either the court or his lawyer, before court closed June 3. This finding is entitled to a presumption of correctness and is reasonable in light of the evidence presented in the state court proceeding. Even if this court reached a contrary conclusion based on its own determination of the facts (which it does not), it would be required to defer to the state court under governing habeas standards.

Therefore, petitioner's claim of ineffective assistance in connection with plea negotiations fails.

### B. Other Claims of Ineffective Assistance

Petitioner claims trial counsel rendered ineffective assistance by failing successfully to impeach prosecution witnesses Lenhardt and Craig Beck and to obtain evidence, through discovery, of "deals" between prosecutors and witnesses. Regardless of the adequacy of Hirschfield's efforts, these claims fail because petitioner cannot establish prejudice. There was ample evidence to convict him even without the testimony of Lenhardt and Craig Beck. Petitioner pursued a defense of innocence, testifying that he was unarmed and Craig Beck shot at petitioner and accidentally killed Beck's own brother. This defense is unbelievable in light of the evidence. Petitioner and

Jay were involved in a dispute and met to fight; petitioner told others he would defend any attack by Jay; Craig Beck chased petitioner out of the garage screaming "you killed my brother"; the shooting was a contact injury inconsistent with an accident by Craig Beck; there was no gun residue on Craig Beck's hands; petitioner fled and led officers on a high-speed chase going 100 miles per hour the wrong way on Highway 99.  The testimony of Lenhardt and Beck was entirely unnecessary to establish petitioner's guilt; thus, any omission by counsel in impeaching these witnesses was non-prejudicial.

Petitioner further claims counsel was ineffective in failing to object to witnesses appearing in jail garb wearing shackles, and in failing to object to the presence of numerous uniformed officers during trial.  Here again the prejudice prong of Strickland is not met.  All incarcerated witnesses, whether testifying for the prosecution or defense, were shackled and wearing jail attire.  See Pet'n 5(8)-(9) (acknowledging it was "the same for all incarcerated witnesses").  It was clear from testimony that witnesses were "firmly ensconced in the drug subculture and suffered definite credibility problems due to their lifestyles and felony convictions. . . ."  Answer, Ex. B at 2.  For example, Lenhardt admitted to injecting methamphetamine with either Jay or Craig Beck on the night of the murder (RT 325-26, 356), and the dispute between petitioner and the Becks was over the theft of methamphetamine laboratory equipment.  (RT 155-56, 315, 382.)  The jury was aware from uncontroverted testimony

1  that petitioner was a flight risk and had tried to elude capture
2  by driving 100 miles per hour the wrong way on Highway 99.  (RT
3  533-34.)  The jury was aware from the substantive testimony that
4  ample law enforcement presence was appropriate.  See <u>Zeitvogel v.
5  Delo</u>, 84 F.3d 276, 283 (8th Cir. 1996).  It is not reasonably
6  likely the jury was so swayed by the security environment it
7  disregarded its duty to assess evidence on the issue of whether
8  petitioner shot Jay Beck.  The jury's ability to refrain from
9  prejudicial assumptions was demonstrated by the fact it acquitted
10 petitioner of the charge of attempting to murder Craig Beck.
11 Petitioner's claims regarding courtroom security fail.
12      Petitioner's claim of cumulative error fails where his other
13 claims establish no constitutional violation.
14      Accordingly, the court recommends the petition be denied.
15      Pursuant to the provisions of 28 U.S.C. § 636(b)(1), these
16 findings and recommendations are submitted to the United States
17 District Judge assigned to this case.  Written objections may be
18 filed within 11 days of service of these findings and
19 recommendations.  The document should be captioned "Objections to
20 Magistrate Judge's Findings and Recommendations."  The district
21 judge may accept, reject, or modify these findings and
22 recommendations in whole or in part.
23      Dated:  August 30, 2005.

                                  /s/ Peter A. Nowinski
                                  PETER A. NOWINSKI
                                  Magistrate Judge